# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re | ) | Chapter 13 Proceedings |
| | ) | |
| **Ryan Michael Mayer,** | ) | Case No: 2:21-bk-06572-DPC |
| | ) | |
| Debtor. | ) | **UNDER ADVISEMENT RULING** |
| | ) | **RE: MOTION TO DISMISS** |
| | ) | **DEBTOR'S CASE PER 11 U.S.C.** |
| | ) | **§§ 1307(c) AND 105(a)** |
| | ) | |
| | ) | |
| | ) | (Not for Publication – Electronic |
| | ) | Docketing ONLY)[1] |
| | ) | |

Ryan Michael Mayer ("Debtor") filed this chapter 13 on August 25, 2021 ("Petition Date"). On September 23, 2021, Creditor Steven Varela ("Varela") filed a Motion to Dismiss Debtor's case ("Dismissal Motion") for "cause" under 11 U.S.C. §§ 1307(c)[2] and 105(a) on the grounds Debtor's ownership interest in, and sole source of income from, a marijuana-related business violated the Federal Controlled Substance Act ("CSA").[3] The chapter 13 trustee, Edward Maney ("Trustee"), joined the Dismissal Motion.[4] The Office of the United States Trustee ("UST"), through Elizabeth Amorosi, filed a Statement of Position supporting the dismissal of Debtor's chapter 13 case.[5]

---

[1] This decision sets forth the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. ("Rule") 7052.
[2] Unless indicated otherwise, statutory citations refer to the U.S. Bankruptcy Code ("Code"), 11 U.S.C. §§ 101-1532.
[3] DE 18. "DE" references a docket entry in this administrative proceeding 2:21-bk-06572-DPC.
[4] DE 23.
[5] DE 22.

The Court held oral argument on the Dismissal Motion on October 19, 2021 ("Initial Hearing").[6] At the continued hearing on November 23, 2021 ("Continued Hearing"), Debtor suggested he could fund a full-payment chapter 13 plan through legally obtained assets.[7]

Having heard the parties' arguments and having reviewed their briefs, this Court now holds Debtor's case must be dismissed. Debtor's only reliable assets from which he could fund a chapter 13 plan come from a business whose operations violate the CSA. Debtor has not shown this Court evidence of any non-CSA violative assets which could support a viable or feasible chapter 13 plan. The Dismissal Motion is hereby granted.

## I. BACKGROUND

### A. Debtor's Bankruptcy Filings.

Debtor filed his Schedules and Chapter 13 Plan on September 9, 2021.[8] Debtor is the President of Rosinbomb, a Nevada corporation ("Rosinbomb").[9] As of the Petition Date, Debtor had served as Rosinbomb's President for six years.[10] According to Debtor's Schedule I, Debtor's sole source of income is his $7,500 monthly salary from Rosinbomb.[11]

Debtor's Schedule A/B lists 11 million shares of restricted common stock in Rosinbomb. The value of that stock was not identified.[12] On the Petition Date, Rosinbomb's stock was listed for $1.40 per share on the Over-the-Counter Market.[13]

---

[6] DE 31.
[7] DEs 34 and 39.
[8] DEs 9 and 12.
[9] DEs 9 and 18, Exhibit 3, page 31.
[10] DE 18, Exhibit 3, page 31 and DE 9, page 22.
[11] DE 9, page 22.
[12] DE 9, page 3.
[13] DE 18, page 3.

According to Rosinbomb's Quarterly Report ending June 30, 2021, Debtor held 28 percent of Rosinbomb's outstanding common stock.[14]

### B. Rosinbomb's Business Operations.

Rosinbomb, formerly known as Maverick Technology Solutions Inc., is a Nevada corporation with its principal place of business in Phoenix, Arizona.[15] Rosinbomb is authorized to conduct business in Arizona but engages in business nationwide.[16]

Rosinbomb manufactures and sells organic extraction presses utilizing a combination of heat and pressure to generate organic concentrates.[17] Rosinbomb's product lines consist of two extraction presses—the "Rosinbomb Rocket" and the "M-60" (collectively the "Machines")—and associated relevant accessories.[18] Rosinbomb's Machines are primarily used to extract and process marijuana rosin.[19] Marijuana, including its rosin, is listed as a Schedule I drug under the CSA.[20]

Although Debtor asserts Rosinbomb's Machines are also used to extract oils from various materials such as peanuts and lavender, Debtor failed to show any sales going to federally legal businesses, despite the Court's request.[21] At the meeting of creditors, Debtor testified that at least 30 percent of Rosinbomb's sales were attributable to the M-60 Model, which is marketed exclusively to commercial marijuana rosin producers.[22] Debtor further acknowledged that Rosinbomb's Machines were not only sold direct-to-consumer but at marijuana dispensaries and marijuana grow operations.[23]

---

[14] DE 18, Exhibit 1, page 9.
[15] DE 18, page 2.
[16] DE 21, page 3.
[17] DE 21, page 3.
[18] DE 18, page 3.
[19] DE 18, page 3.
[20] DE 18, page 3; Rosin is a form of concentrate commonly referred to as "dabs," made by applying heat and pressure to cannabis plants.
[21] DEs 31 and 39.
[22] DE 23, page 2.
[23] DE 23, page 1.

Rosinbomb's website, advertisements, investor solicitation materials, and Machines' instructions all target the marijuana industry.[24] One article featured by Weedmaps.com[25] deemed the Rosinbomb Rocket "one of the best personal use rosin presses on the market."[26] In another article spotlighting Rosinbomb's feature in Weedmaps.com, Rosinbomb's CEO described Rosinbomb "[a]s the global leader in solventless rosin press technology."[27] Rosinbomb's website also includes testimonials from experts and entrepreneurs in the marijuana industry about the Machines' application to marijuana rosin.[28] Rosinbomb's company spokesperson is Tommy Chong, a legendary figure in the marijuana industry.[29]

### C. The Parties' Arguments.

At the Initial Hearing, Varela and the Trustee argued Debtor's case was not filed in good faith because Debtor's ownership interest and sole source of income (collectively the "Assets") derived from the manufacture and sale of "drug paraphilia" in violation of the CSA.[30] The Trustee further argued he would be exposed to liability under 18 U.S.C. § 2(a) and forfeiture under 21 U.S.C. § 853(c) by accepting chapter 13 plan payments from Debtor where such payments derived from Rosinbomb's federally illegal operations.[31] Debtor responded proposing that he could fund a chapter 13 plan through an expected inheritance ("Inheritance") from his deceased father's estate.[32]

---

[24] DEs 18 and 24.
[25] DE 18, Exhibit 3, page 37. Rosinbomb deemed Weedmaps.com one of the leading and preeminent news and information sites in the marijuana industry.
[26] DE 18, Exhibit 3, page 31.
[27] DE 18, Exhibit 3, page 37.
[28] DE 24, page 3.
[29] DE 24, page 3.
[30] DE 31.
[31] DEs 31 and 23.
[32] DE 31.

At the Continued Hearing, Debtor disclosed the Inheritance was subject to ongoing state court litigation.[33] Debtor did not have any information relating to the amount of the Inheritance or when it would come to fruition.[34] Given the uncertainty of the Inheritance, Debtor filed an Amended Plan proposing to fund the Amended Plan with income generated by a newly formed business— Mayer Enterprise, LLC ("Mayer Enterprise").[35] Debtor formed Mayer Enterprise after the Initial Hearing.[36] Unlike Rosinbomb, Mayer Enterprise would market and sell an extraction press specifically designed to extract cannabidiol (CBD) from hemp plants.[37] Debtor claims this business would not violate the CSA.[38]

The UST and Varela maintained that the Court should dismiss Debtor's case because Mayer Enterprise has no financial track record, and the Inheritance was the subject of ongoing litigation.[39] The Trustee argued that, despite Debtor's proposal to fund his Amended Plan through legal sources, Debtor could not segregate his CSA violative Assets from any legally obtained income.[40]

## II. JURISDICTION

The Court has jurisdiction over this bankruptcy case and the prospect of dismissing this case pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A).

## III. ISSUE

A. Where Debtor's ownership interest in and sole regular source of income derives from Rosinbomb, does this income source violate the CSA?

---

[33] DEs 31 and 34.
[34] DE 31.
[35] DEs 31; 34, page 2; and 35.
[36] DEs 39 and 35.
[37] DE 34, page 3.
[38] DE 35, page 3.
[39] DE 39.
[40] DE 33, page 1.

B.   Is Debtor capable of funding a chapter 13 plan through non-CSA violative assets?

IV.   **ANALYSIS**

A.   **Debtor's Income is Rooted in a Business Which Violates the CSA.**

Pursuant to § 1307(c), a court may dismiss a chapter 13 case for "cause." Section 1307(c) sets forth a nonexclusive list of factors that constitute "cause" for dismissal.[41] In *In re Burton,* the 9th Circuit Bankruptcy Appellate Panel ("BAP") held that § 1307's flexible "cause" standard, "coupled with the abuse of discretion standard of review on appeal," gives bankruptcy courts the authority to dismiss a debtor's case in which marijuana-related business activity is present.[42] However, the 9th Circuit BAP has made clear that "the mere presence of marijuana near a bankruptcy case does not automatically prohibit a debtor from bankruptcy relief."[43]

1.   The Controlled Substance Act.

Under § 843(a)(7) of the CSA, it is a federal crime to "manufacture" or "distribute" any "equipment, chemical, product or material which may be used to manufacture a controlled substance . . . knowing, intending, or having reasonable cause to believe that it will be used to manufacture a controlled substance . . . ."[44]

The CSA also makes it unlawful for any person to offer or sell "drug paraphernalia," which is defined as any equipment or product "use[d] in manufacturing . . . producing, processing . . . or otherwise introducing . . . a controlled substance."[45] Section 863(e) of Title 21 of the United States Code sets forth a nonexclusive list of

---

[41] *In re Leavitt*, 171 F.3d 1219, 1223-24 (9th Cir. BAP 1999).
[42] *In re Burton*, 610 B.R. 633, 639 (9th Cir. BAP 2020).
[43] *See Id.* at 637; *Garvin v. Cook Invs. NW, SPNWY, LLC* (*In re Cook Invs. NW*), 922 F.3d 1031,1036 (9th Cir. 2019); *In re Olson*, 2018 WL 989263, at *7 (9th Cir. BAP Feb. 5, 2018).
[44] 21 U.S.C. § 843(a)(7); *See also In re Way to Grow, Inc.* 597 B.R. 111, 127-29 (Bankr. D. Colo. 2015) (finding debtors violated 21 U.S.C. § 843(a)(7) by knowing its products would be used to manufacture marijuana).
[45] 21 U.S.C. §§ 863(a)(1), 863(d).

factors that a court may consider when determining whether an item constitutes "drug paraphernalia," including: (1) instructions, advertisements, and descriptive materials accompanying the product; (2) expert testimony concerning the product's use; (3) how the product is displayed for sale; (4) the scope of the product's legitimate use in the community; and (5) the ratio of sales of the product to the total sales of the business enterprise.[46]

There is no genuine dispute that Rosinbomb manufactures and sells "drug paraphernalia" in violation of the CSA.[47] Here, the instructions, advertisements, and other descriptive materials accompanying Rosinbomb's Machines focus exclusively on the Machines' application to rosin.[48] Second, the "Ask the Expert" section of Rosinbomb's website includes only testimonials promoting the Machines' use in the marijuana industry.[49] Although Debtor argues Rosinbomb's Machines may be used in other industries, such as the peanut and lavender industry, Debtor failed to present the Court with evidence of any sales in other industries.[50]

Even if the Court were to find that Rosinbomb's Machines do not constitute "drug paraphernalia," Rosinbomb is also violating § 843(a)(7) of the CSA. There is no dispute that Rosinbomb has "knowledge" that customers use the Machines to manufacture rosin. Rosinbomb most certainly has "reasonable cause to believe" its Machines are used for such purpose, given that Rosinbomb's website and marketing materials solely promote use of the Machines in the marijuana industry.[51]

This Court finds Rosinbomb's business operations violate the CSA.

---

[46] 21 U.S.C. § 863(e).
[47] Debtor argued in his initial Objection (DE 21) that the CSA did not apply because Rosinbomb was authorized to manufacture and distribute the Machines in the State of Arizona. Section 863(f) provides that the CSA does not apply to "any person authorized by local, State, or Federal law . . ." The Court does not address this issue because it was established, and Debtor does not dispute, that Rosinbomb sells its Machines nationwide.
[48] DE 18, Exhibits 2-4; DE 24, Exhibits 1-6.
[49] DE 24, Exhibit 3.
[50] DE 34.
[51] DE 18, Exhibits 2-4; DE 24, Exhibits 1-6.

2. <u>Debtor's Assets Are Derived Directly from Rosinbomb's CSA Violations.</u>

Courts have consistently dismissed cases where (1) debtors were directly engaged in violations of the CSA, or (2) debtor's reorganization efforts depended on proceeds derived from CSA violations.[52] Debtor's case presents the latter issue.

This Court previously held in *In re Medpoint Mgmt., LLC* that CSA violative assets cannot be administered through a debtor's bankruptcy.[53] There, the debtor provided management services to a medical marijuana business, and the debtor's assets were marijuana-related.[54] The Court found that "the dual risks of forfeiture" of the debtor's assets "and [the] trustee's inevitable violation of the CSA in administration . . ." of the debtor's assets constituted cause to dismiss the creditors' involuntary petition.[55]

In *In re Way to Grow, Inc.*, the debtors sold hydroponic gardening equipment.[56] The debtors' broad customer base used the equipment for growing a variety of crops, including marijuana.[57] The court held that the debtors had "reasonable cause to believe" that its customers were using the equipment to manufacture marijuana in violation of the CSA.[58] The debtors were known for "being experts in 'advising on cannabis growing and . . . selling products . . . geared toward cannabis.'"[59] The court dismissed the debtor's case because the debtors could not extricate themselves from the marijuana business and successfully reorganize.[60]

---

[52] *In re Burton*, 610 B.R. at 638; *In re Medpoint Mgmt., LLC*, 528 B.R. 178, 184-85 (Bankr. D. Ariz. 2015) *vacated in part*, *In re Medpoint Mgmt. LLC*, 2016 WL 3251581 (9th Cir. BAP June 3, 2016); *In re Arenas*, 535 B.R. 845, 853 (10th Cir. BAP 2015); *In re CWNevada LLC*, 602 B.R. 717 (Bankr D. Nev. 2019); *In re Way to Grow, Inc.*, 597 B.R. at 120 (Bankr. D. Colo. 2015); *In re Johnson*, 532 B.R. 53, 56-57 (Bankr. W.D. Mich. 2015); *In re Rent-Rite Super Kegs W. Ltd.*, 484 B.R. 799, 810 (Bankr. D. Colo. 2012).
[53] *In re Medpoint Mgmt. LLC*, 528 B.R. at 184-85.
[54] *Id.* at 180-181.
[55] *Id.* at 186.
[56] *In re Way to Grow*, 597 B.R. at 114-15.
[57] *Id.* at 27.
[58] *Id.* at 126-129.
[59] *Id.* at 129.
[60] *Id.* at 132.

In *In re CW Nevada*, the debtor produced and distributed medical and recreational marijuana. Multiple creditors filed motions to dismiss pursuant to § 1112(b).[61] The court dismissed debtor's case, finding debtor's primary source of income came from clear violations of the CSA.[62]

In *In re Arenas* the debtors grew and sold marijuana and received rental income from the property they leased to a marijuana dispensary.[63] In response to the United States Trustee's motion to dismiss, the debtors sought to convert their case to a chapter 13.[64] The bankruptcy court dismissed the case and denied the debtors' motion to convert because any chapter 13 reorganization proposed by the debtors "would be funded from profits of ongoing criminal activity."[65] On appeal, the 10th Circuit BAP affirmed, agreeing that "neither a chapter 7 nor 13 trustee" could administer the debtors' assets.[66] The 10th Circuit BAP held that the debtors could not support their chapter 13 plan without violating federal law and, therefore, could not seek relief under chapter 13.[67]

Here, although Rosinbomb manufactures and sells "drug paraphernalia" in violation of the CSA, Rosinbomb is not seeking bankruptcy relief. Debtor, in his individual capacity, filed for bankruptcy. The Debtor is personally a step removed from the illegal marijuana activity. Debtor is not directly providing marijuana-related management services.[68] Debtor is not personally selling equipment used to process marijuana.[69] Debtor does not distribute or produce marijuana nor receives marijuana income from his direct violation of the CSA.[70]

---

[61] *In re CWNevada LLC*, 602 B.R. at 721-22. This case provides an excellent review of the law pertaining to the intersection of marijuana and bankruptcy.
[62] *Id.* at 730.
[63] *In re Arenas*, 535 B.R. at 847-48.
[64] *Id.* at 848.
[65] *Id.* at 851.
[66] *Id.* at 854.
[67] *Id.*
[68] *See In re Medpoint Mgmt., LLC*, 528 B.R. at 180-181.
[69] *See In re Way to Grow*, 597 B.R. at 114-15.
[70] *See In re CWNevada LLC*, 602 B.R. at 721-22; *see also In re Arenas*, 535 B.R. at 847-48.

At the Initial Hearing, the Court questioned the parties as to what point a debtor's connection to the marijuana becomes too attenuated to require dismissal of a debtor's case.[71] The Court does not attempt to answer that question today. Suffice to say that Debtor's sole source of income flows directly and exclusively from Rosinbomb's illegal operations. Debtor's principal asset is his equity ownership in Rosinbomb. Debtor's connection to Rosinbomb's CSA violative operations is not too attenuated to warrant dismissal of his chapter 13 case. In the case at bar, Debtor's income derived from CSA violations cannot support a debtor's Chapter 13 reorganization efforts. Debtor's CSA violative Assets cannot be administered through his chapter 13 bankruptcy.

B. **Viability of Debtor's Alternative Funding Proposals.**

Section 1325(a)(6) provides as a condition to confirmation that "the debtor will be able to make all payments under the plan." Section 1325(a)(6) is known as the "feasibility requirement."[72] Courts have expressed a willingness to allow marijuana-related debtors to seek bankruptcy relief if a debtor proposes a feasible plan without the support of CSA violative assets.[73]

In *In re Cook Invs. NW*, the chapter 11 debtor leased space to and accepted rental income from a marijuana business.[74] The debtor filed an amended plan proposing to reject the lease.[75] The amended plan further provided that debtor would make payments under the plan from legally obtained income streams.[76] The bankruptcy court confirmed the debtor's amended plan over the trustee's motion to dismiss and objection to the

---

[71] DE 31. The Court posed a hypothetical scenario: If Debtor paid his nanny from his Rosinbomb salary, could the nanny seek bankruptcy relief?
[72] *In re Gavia*, 24 B.R. 573, 574 (9th Cir. BAP 1982).
[73] *See In re Cook Invs. NW*, 922 F.3d at 1032; *In re Arm Ventures,* 564 B.R. 77, 86 (Bankr. S.D. Fla. 2017) (denying creditor's motion to dismiss and allowing the debtor 14 days to file an amended plan that did not rely on marijuana income).; *In re McGinnis*, 453 B.R. 770, 773 (Bankr. D. Or. 2011) (finding if debtor proposed an amended chapter 13 plan that did not rely on CSA violative income streams, the court would confirm the plan).
[74] *In re Cook Invs. NW*, 922 F.3d at 1033-34.
[75] *Id.*
[76] *Id.*

amended plan.[77] On appeal, the 9th Circuit affirmed the bankruptcy court's decision, agreeing the debtor's amended plan was lawfully proposed and met the Code's confirmation requirements.[78]

Here, Debtor's Amended Plan proposes to pay creditors through legally obtained income generated by Mayer Enterprise and Debtor's potential Inheritance.[79] Unlike the debtor in *In re Cook Invs. NW*, Debtor has not shown this Court that the income from Mayer Enterprise or his expected Inheritance can feasibly support payments under his Amended Plan.[80] Debtor did not produce any evidence that alternative funding even exists. With respect to the Inheritance, Debtor was unable to provide any information on the possible amount of the Inheritance or the time by which it is expected to be received.[81] As for Mayer Enterprise, Debtor could not point to any sales, any assets, or any records indicating past performance or likely future net revenues.[82]

The issue raised by the Trustee as to whether Debtor can segregate his CSA violative Assets from legally obtained money is not ripe.[83] Debtor failed to demonstrate that legally obtained income exists to support the confirmation of his Amended Plan.

C. **Varela and Unclean Hands.**

At the Initial Hearing, the Court questioned Varela's connection to Rosinbomb.[84] Varela's $204,536.75 claim[85] arose from a Washington state court judgment[86] entered against Debtor for selling Varela Rosinbomb's restricted stock in violation of the

---

[77] *Id.*
[78] *Id.* at 1036.
[79] DE 31.
[80] DEs 34 and 39.
[81] DEs 34 and 39.
[82] DEs 34 and 39.
[83] DE 33.
[84] DE 31.
[85] Proof of Claim ("POC") 12-1.
[86] The Snohomish County Superior Court for the State of Washington entered a judgment against Debtor in favor of Varela on June 17, 2021. *See Steven Varela v. Ryan Mayer*, Case NO. 20-2-02929031.

Washington Securities Act.[87] The Court has concern that Varela may lack standing by coming to this court of equity with "unclean hands" because he is tainted with the very same marijuana-related business activity which requires this Court to dismiss Debtor's bankruptcy case.[88]

However, because the Trustee and UST independently request that this Court dismiss Debtor's case, the Court need not decide whether Varela, as a former investor in Rosinbomb, has standing to bring the Dismissal Motion.[89]

## V. CONCLUSION

Debtor is ensnared between his involvement in a business that is legal under the laws of Arizona but illegal under federal law. Unless and until federal law and Arizona law align to permit Rosinbomb's Machines to legally generate marijuana rosin, Debtor may not seek bankruptcy protection. Debtor's *only* reliable assets which could support a feasible chapter 13 plan are derived from ongoing CSA violations. These illegal proceeds cannot support Debtor's chapter 13 plan. The Court hereby dismisses Debtor's chapter 13 case for "cause" pursuant to §§ 1307(c) and 105(a).

**ORDERED**

**DATED AND SIGNED ABOVE**

**To be Noticed through the BNC to:**
Interested Parties

---

[87] DE 32.
[88] *See Young v. United States*, 535 U.S. 43, 50 (2002) (finding that the bankruptcy court is a court of equity); *see also In re* Everett, 364 B.R. 711, 723 (Bankr. D. Ariz. 2007) (holding "the 'unclean hands' defense applies to conduct immediately related to the cause in controversy").
[89] *See Hall v. Wright*, 240 F.2d 787, 794-95 (9th Cir. 1957) (holding "[u]nder the 'clean hands' doctrine, one who does not come into equity with clean hands, and keeps them clean, must be denied all relief, whatever may have been the merits of his claim").